STATE *v.* J. J. NEWMAN LUMBER COMPANY.

[59 South. 923.]

1. CONSTITUTIONAL LAW. *Health. Police power. Restrictions. Statutes. Manufacturing. Repairing. Restraint of freedom of contracts. Regulation of hours of employment. Chapter* 157, *Laws* 1912.

The Legislatures of the states have the right under their police power to enact proper laws to regulate and provide for the "safety, the health, the morals, and the general welfare of the public."

2. CONSTITUTIONAL LAW. *Legislature. Functions of courts.*

The duty of the courts is to construe the law and apply it to the case presented and it may decide·upon its constitutionality. But it is not for the court to decide whether a law is needed and advisable in the general government of the people; this is for the legislature to decide.

3. CONSTITUTIONAL LAW. *Police power. Restrictions.*

A state cannot by its laws unduly and unnecessarily interfere with a person in the exercise of his inherent rights or the unlimited control and use of his property, but there was no purpose in the fourteenth amendment to the Constitution of the

United States to prevent in any manner the state from making the proper regulations for the promotion of the health, peace, morals, education, and good order of the people.

4. LAWS 1912, SECTION 157. *Construction. Manufacturing. Repairing. Definitions.*

Section 157, Laws 1912, which makes it unlawful for any employer in a certain class to work employees more than ten hours per day, except in cases of emergency, is not so general in its terms that it is dificult to limit those who may be engaged in manufacturing or repairing. "Manufacturing" may be defined as the system of industry which produces manufactured articles, and to "manufacture" as the production of articles for use from raw or prepared materials, by giving to these materials new forms, quantities, and properties or combinations, whether by hand labor or machinery. "Repair" is to make whole or restore an article or thing to its completeness.

5. CONSTITUTIONAL LAW. *Restraints on freedom of contracts. Police power.*

A law which promotes the health, morals, and good order of the people affected, is not unconstitutional in that it interferes with the "right of contract" as this right itself is subject to certain limitations, which the state may lawfully impose in the exercise of its police power.

6. SAME.

Regulations of lawful trade or business are within the exercise of the police power and unless they are so unreasonable that the property and personal rights of the citizen are unnecessarily and arbitrarily interfered with or destroyed, they do not extend beyond the power of the state to adopt.

7. LAWS 1912, CHAPTER 157. *Regulation of hours of employment. Police power.*

Chapter 157, Laws 1912, is not "an unreasonable, unnecessary, and arbitrary interference with the property, liberty, rights, privileges or immunities of those engaged in manufacturing or repairing and their employees, but is a valid exercise of the police power of the state.

APPEAL from the circuit court of Lamar county.

HON. A. E. WEATHERSBY, Judge.

The J. J. Newman Lumber Company was indicted for working an employee more than ten hours per day.

From a judgment sustaining a demurrer to the indictment the state appeals.

The facts are stated in the opinion of the court.

*Frank Johnston,* assistant attorney-general, for the state.

There is only one objection presented by the demurrer which is entitled to any serious consideration by the court, or upon which any argument of counsel for the state is necessary, and that is the objection that this statute is in violation of that provision of the fourteenth amendment to the Constitution of the United States which prohibits any discriminating class legislation by the several states.

At the outset, I will state to the court that the universal constitutional rule of construction applied to the operation of the fourteenth amendment in respect to the powers of legislation of the states generally under what is known as the "police power" of the state, and particularly, as in the present case, to the police power of the state as it regards the regulation of the hours of labor of employees in the state and which are commonly called "Labor Laws."

In the second place, it has been universally held, not only by the decisions of the various state court that have had occasion to judically examine this question, or doctrine, of constitutional law, but the Supreme Court of the United States in its various utterances on the subject, and all of which are in entire harmony in respect to the constitutional principle of construction and interpretation involved, held the constitutional doctrine that it was never the purpose, or intention, of the fourteenth amendment to interfere with, or to impair, much less to abrogate, the power of the several states known as the "police power."

It has been announced again and again by a uniform line of Federal and state decisions on this subject that

the fourteenth amendment does not interfere, nor was it ever intended to interfere with, or impair the police power of the state which is a power universally defined as one to regulate, "the safety, the health, the morals, and the general welfare of the public."

This general subject has been given a most thorough and exhaustive analysis and exposition by the decision of the Supreme Court of the United States in the case of *Lochner* v. *New York,* 198 U. S. 45, and while that decision of the Supreme Court of the United States involved the construction and constitutionality of the act of the New York legislature regulating the hours for work by employees in bakeries, and holding that such a statute as that exceeded the limits of the police powers of the state under the fourteenth amendment, yet the opinion contains a most elaborate and clear and exhaustive exposition of the general constitutional question involved in and presented by this character of state legislation.

In that case, the court expressly announced the doctrine that the fourteenth amendment was never intended to interfere with the exercise of the police power of the states to regulate the "safety, health, morals and general welfare of the public."

Upon this abstract question and construction of constitutional law, and as containing also a full exposition of this doctrine as I have just stated to the court, I will cite the following cases, viz.: *Mugler* v. *Kansas,* 123 U. S. 623; *In re Kemmler,* 136 U. S. 624; *Crowley* v. *Christensen,* 137 U. S. 86.

In the case of *Holden* v. *Hardy,* 169 U. S. 366, involving the constitutionality of a Utah statute, the Supreme Court sustained the constitutionality of the act. The Utah statute regulated the hours of employees in mines, smelting works, and works for the reduction or refining of ores or metals. The court said, in its opinion in *Holden* v. *Hardy,* "We think the act in question may be sus-

tained as a valid exercise of the police power of the state. The enactment does not propose to limit the hours of all workmen, but merely those who are employed in underground mines, or in smelting, reduction or refining ores or metals. These employments, when too long pursued, have been judged to be detrimental, by the legislature, to the health of the employees, and so long as there are reasonable grounds for believing that this is so, its decision cannot be reversed by the Federal courts.''

This precise doctrine, on the exact point as to the test of the extent of the power of the state to regulate labor is again stated in the case of *Gundling* v. *Chicago,* 177 U. S. 183, in which the court used still stronger language and broader language in the direction of sustaining the power of the states, than in other decisions. The court, in that case, said that the power of a state in this respect, that is to say, in the exercise of this police power, would not be condemned as invalid under the fourteenth amendment unless it was ''so utterly unreasonable and extravagant as to amount to a mere arbitrary interference with the right to contract.''

In *State* v. *Miller,* an Oregon decision, reported in 85 Pa. 858, on the subject of the constitutionality of a state law prescribing the hours of labor for females in factories, the court announced this rule and tested for the exercise of the police power of the state in regard to this particular subject in the same manner, and in the identical language employed by the Supreme Court in the opinion in *Gundling* v. *Chicago,* 177 U. S. 183. That court, in an elaborate exposition of the police power of a state, and the extent and operation of the provisions of the fourteenth amendment, prohibiting discriminating class legislation by the states, held the same view that has been given by the Supreme Court of the United States in the case just cited, and in its opinion said that this power of the state would be upheld as valid and

constitutional in all cases unless it was "so utterly un-
reasonable and extravagant as to amount to a mere ar-
bitrary interference with the right of contract."

The same constitutional doctrine precisely was an-
nounced and the same line of demarcation between the
exercise of its constitutional and unconstitutional pow-
ers in respect to the police power was given in the Mas-
sachusetts case of *Commonwealth* v. *Hamilton Manu-
facturing Company,* 120 Mass. 383.

So the decision of the Supreme Court of the United
States in *Lawton* v. *Steele,* 152 U. S. 133, was to the ef-
fect that this class of state laws were valid and constitu-
tional unless they were to be considered as absolutely ar-
bitrary in their character.

The same doctrine is discussed and announced in the
case of *State* v. *Miller,* the Oregon case above cited, which
was taken to the Supreme Court of the United States by
writ of error and affirmed by that court and reported in
208 U. S. 412.

I also refer the court to the decision of the supreme
court of Utah in *Holden* v. *Hardy,* 14 Utah, 38, reported
also in 37 L. R. A. 104.

It was said by the Supreme Court of the United States,
in the case of *Lockner* v. *New York,* 198 U. S. 45, that,
"If the act be within the power of the state, it is valid
although the judgment of the court might be totally op-
posed to the enactment of such a law.

Upon my investigation of this question on the deci-
sions, I find the constitutional doctrine and principle
clearly announced by the text-writers, and by all of the
decisions with extraordinary and singular uniformity,
that the individual right to contract is universally held
to be subordinate to the police power of the state which
is to make proper regulations within the reasonable dis-
cretion of the legislature over the subjects of the health,
safety, morals, or welfare of society. Cooley on Con-
stitutional Limitation, 707; *Holden* v. *Hardy,* 169 U. S.

311; *Commonwealth* v. *Hamilton Mfg. Co.*, 120 Mass.
383; *Ex parte Kuback*, 85 Cal. 274; *Frazier* v. *People*,
141 Ill. 171; *State* v. *Lumis*, 115 Mo. 307; *Law* v. *Printing Co.*, 41 Neb. 227; *Seattle* v. *Smythe*, 22 Wash. 327.

It is also the doctrine of the constitutional law of universal acceptance that a large and wide discretionary power must be left to the legislatures of the several states in regard to the exercise of this police power. Among the many decisions which have ably discussed and presented this question, are: *Lawton* v. *State*, 152 U. S. 133; *Jackson* v. *Massachusetts*, 197 U. S. 11; *In re Boyce*, 75 Pa. 1; s. c., 65 L. R. A. 47; *State* v. *Buchanan*, 70 Penn. 52.

*S. E. Travis*, for appellee.

The second ground of demurrer raises directly the constitutional questions involved, both as to the state and Federal Constitutions. It is as follows:

"It appears from the face of said indictment that it is based on chapter 157, Laws of Mississippi, 1912, which act is discriminatory, unconstitutional, invalid and void, and the said indictment is insufficient in law for the following reasons:

"(a)   It is violative of section 14, Constitution of Mississippi, 1890, because it deprives said defendant, and those sought to be made liable thereunder, of liberty and property without due process of law.

"(b)   It is violative of section 16 of said Mississippi Constitution, because it impairs the obligation of contracts between the said defendant, as employer ,and its said employees, as well as of contracts between all employers and employees embraced within its terms.

"(c)   It is violative of section 24 of said Mississippi Constitution, because its provisions operate injuriously to the person and property of said defendant and others sought to be made liable thereunder, and deny to said defendant and such others, 'remedy by due course of

law,' and the 'right and justice' guaranteed by said constitutional provision.

"(d) It is violative of section 10, article 1 of the Constitution of the United States, prohibiting any state from passing a 'law impairing the obligation of contracts,' because it impairs the obligation of the contracts alleged to have existed between the said defendant and its said employees.

"(e) It is violative of section 1 of the fourteenth amendment to the Constitution of the United States in three particulars: 1. It abridges the privileges and immunities of the said defendant, a citizen of the United States; 2. It deprives the said defendant of liberty and property without due process of law; and 3. It denies to the said defendant, a citizen of the said state of Mississippi and of the United States, 'the equal protection of the law.'

"(f) It is violative of that portion of section 2, article 6 of the Constitution of the United States, which makes that instrument and the laws made in pursuance thereof 'the supreme law of the land,' because it is unreasonable, unjust, arbitrary and discriminatory, and interferes with the property, liberty, rights, privileges and immunities of the said defendant, and others sought to be made liable thereunder, protected by the aforesaid provisions of the Constitution of the United States."

These constitutional questions are so related and the courts so deal with them that they may be treated together. The act in question involves the liberty, the property, and the privilege of pursuing an ordinary calling, so long as such right and privilege are so exercised as not to injuriously affect the public health, safety, morals or general welfare, are within the protection of both the state and Federal Constitutions; likewise, the right to buy or sell labor is a part of the liberty protected by these instruments; and, hence, the legislation which injuriously affects the citizen in these respects violates all

the constitutional provisions mentioned.    Apply these
principles to the case at bar.   The appellee was indicted
and arrested, under an act embracing only those engaged
in manufacturing or repairing, for contracting with its
employees to work and working them more than ten
hours per day in a business which, so far as the court
can know, in no way affects the public health, safety mor-
als or general welfare.   This being the case, the act in
question deprives the appellee or liberty and property in
violation of section 14 of the Mississippi Constitution,.
it impairs the obligation of the contracts between ap-
pellee and its employees in violation of section 16 of said
instrument, it deprives the appellee of ''right and jus-
tice'' and ''remedy by due course of law'' in violation
of that section of said instrument, and it ''impairs the
obligation of contracts'' in violation of section 10, article
1 of the United States Constitution, abridges the ''privi-
leges and immunities'' of the appellee, deprives it of
''liberty or property'' and denies to it ''the equal pro-
tection of the laws,'' in violation of section 1 of the
fourteenth amendment of said United States Constitu-
tion, and violates that portion of section 2, article 6 of
the said United States Constitution which makes that in-
strument and the laws made in pursuance thereof ''the
supreme law of the land,'' being unreasonable, unjust,
arbitrary, discriminatory, and interfering with the prop-
erty, liberty, rights, privileges and immunities of the ap-
pellee, protected by the aforesaid United States consti-
tutional provisions.

We have examined the authorities extensively and be-
lieve they support our contention as to the unconstitu-
tionality of this act with practical unanimity.

*Lochner* v. *New York,* 198 U. S. 45, 49 L. Ed. 937, is one
of the leading cases on the subject of state regulation
of hours of labor, and is demonstrative of our conten-
tion that the act in question is violative of the United
States Constitution.

The following authorities, also, bear directly upon the points raised by the second ground of the demurrer: "It was said by Mr. Justice BRADLEY in *Butchers' Union S. H. & L. S. L. Co.* v. *Crescent City L. S. L. & S. H. Co.,* 111 U. S. 746, 762 (28:585,589), in the course of his concurring opinion in that case, that 'the right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal, that they are endowed by their Creator with certain inalienable rights; and among these are life, liberty, and the pursuit of happiness.'   This right is a large ingredient in the civil liberty of the citizen.   Again, on page 764 (589), the learned justice said: 'I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States.'   And again, on page 765 (590): 'But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him, to a certain extent, of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers which, as already intimated, is a material part of the liberty of the citizen.'   It is true that these remarks were made in regard to questions of monopoly, but they well describe the rights which are covered by the word 'liberty' as contained in the fourteenth amendment."

*Allgeyer* v. *State of Louisiana,* 165 U. S. 578, 41 L. Ed. 832-836: "And so as to the right to contract. The liberty, of which the deprivation without due process of law is forbidden, 'means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoy-

ment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his purposes above mentioned.' "

*Williams* v. *Fears,* 179 U. S. 270, 45 L. Ed. 186-190: "'The liberty guaranteed by the Constitution includes the right to freely buy and sell, make contracts and have them enforced as others may.''

*State of Missouri* v. *Loomis,* 21 L. R. A. 789, and note thereunder: "The privilege of contracting is both a liberty and a property right of which one cannot be deprived without due process of law.

"The right to labor or employ labor and make contracts in respect thereto upon such terms as may be agreed upon is included in the guaranty of Constitution, article 2, section 2, that no person shall be deprived of life, liberty, or property without due process of law."

*Ritchie* v. *People of State of Illinois,* 29 L. R. A. 79: "A statute which makes it unlawful to discharge an employee because he belongs to a lawful labor organization, and which provides for the recovery of damages for such discharge, is void. The right to terminate a contract within the protection of the state and Federal Constitutions, which guarantee to every citizen the protection of life, liberty and property. (Syllabus by the court.)''

*Coffeyville Vit. Brick & Tile Co.* v. *Perry,* 76 Pac. 848: "Defendant discharged an employee, engaged and paid by the day, for joining a labor union. Held, that a conviction therefor must be reversed, since the right to freely enter into and terminate contracts, subject to civil liability for unwarranted termination, is one of the rights of liberty and property protected by the Federal and state Constitutions, and a statute which deprives the employer of his right to terminate his contract without

criminal liability therefore deprives him of his property without due process of law. . . .

"Defendant discharges an employee for joining a labor union. Held, that a conviction therefore must be reversed, since the statute granted a privilege to union laborers not extended to nonunion men, in that a nonunion man could be discharged for any reason, at the will of the employer, while the union man could not be discharged for belonging to a union, and was hence unconstitutional."

*Gillespie* v. *People,* 58 N. E. 1007: "The third section of chapter 63, Acts 1887, which prohibits persons engaged in mining and manufacturing from issuing for the payment of labor any order or paper, except such as is specified in the said act, is unconstitutional and void."

*State of West Virginia* v. *Goodwill et al.,* and *State of West Virginia* v. *Minor,* 6 L. R. A. 621, and note thereunder: "A statute forbidding an employer to impose a fine upon, or to withhold wages from, an employee engaged in weaving for any imperfections in the weaving is in violation of a constitutional provision which enumerates among the natural and inalienable right of acquiring, possessing, and protecting property, as this right includes the right to make reasonable contracts which shall be under the protection of the law."

*Commonwealth of Massachusetts* v. *Perry,* 14 L. R. A. 325 and notes: "A statute requiring the wages of coal miners, if based on the quality of coal mined, to be computed on the whole quantity mined before it is reduced by screening or any other device, and providing that all coal shall be weighed in the cars before being dumped into screens or chutes is unconstitutional as an attempt to take away without due process of law the property right of contracting in respect to such wages."

*Ramsey* v. *People,* 17 L. R. A. 853: "The liberty to enter into contracts by which labor may be employed in such way as the laborer may deem most beneficial, and

to others to employ such labor, is necessarily included in the constitutional guaranty of the right to property."

*Braceville Coal Co.* v. *People,* 22 L. R. A. 340: "A statute requiring the weekly payment of wages, by interfering with the liberty of contract, deprives citizens of their liberty and property without due process of law."

*Republic Iron & Steel Co.* v. *State,* 62 L. R. A. 136: "The legislature cannot interfere with the right of parties to contract on a subject which is purely and exclusively private, unaffected by any public interest, or duty to person, to society, or government, where the parties are capable of contracting.

"The right of an individual to contract to labor with a period of credit for payment of his wages is included in the constitutional right to acquire and possess property."

*Leep* v. *St. Louis, I. M. & S. R. R. Co.,* 23 L. R. A. 264: "Appeal by defendant from a judgment of the circuit court for Lee county convicting it of a violation of a statute requiring it to pay its employees in nothing but lawful money. Reversed."

*Avent-Beattyville Coal Co.* v. *Commonwealth,* 28 L. R. A. 273: "A statute forbidding, under penalty, an employer from discharging an employee because he is a member of a labor organization, violates the constitutional guaranty of liberty."

*State ex rel. Zillmer* v. *Kreutzberg,* 58 L. R. A. 748: "A statute which makes it unlawful to discharge an employee because he belongs to a lawful labor organization, and which provides for the recovery of damages for such discharge, is void. The right to terminate a contract is within the protection of the state and Federal Constitutions, which guarantee to every citizen the protection of life, liberty and property."

*Coffeyville Vit. Brick & T. Co.* v. *Perry,* 66 L. R. A. 185: "Act June 17, 1893, section 5, which declared that 'No female shall be employed in any factory or work-

shop.more than eight hours in any one day or forty-
eight hours in any one week,' is unconstitutional, as de-
priving persons of property and liberty without due pro-
cess of law.''

*Ritchie* v. *People of State of Illinois,* 40 N. E. 454: ''A
statute attempting to make a corporation, on the dis-
charge of an employee, pay the whole amount of his
stipulated wages up to that date, although by his failure
to perform his contract he has damaged the corporation,
is unconstitutional, as taking property from the corpo-
ration without due process of law.''

*Leep* v. *St. Louis, I. M. & S. R. R. Co.,* 23 L. R. A. 264:
''A statute making it unlawful to work more than eight
hours per day in mines or smelters is in violation of
Constitution, article 2, section 3, guaranteeing liberty
and the right to acquire, possess, and protect property.''

*Re Thomas A. Morgan,* 47 L. R. A. 52: ''An act to
secure laborers and others the payment of their wages,
and prescribing a penalty for the violation of this act,
etc.

''The act is unconstitutional and void, in that it vio-
lates the fourteenth amendment to the Constitution of
the United States.''

*Kansas* v. *Haun,* 47 L. R. A. 369: ''A statute making
it unlawful for a person or corporation engaged in min-
ing or manufacturing to engage or be interested in keep-
ing or controlling any truck store, shop, or scheme for
furnishing supplies, tools, clothing, provisions or gro-
ceries to employees, but which does not apply to those
employing laborers in other branches of business, vio-
lates the constitutional guaranty that no person shall be
deprived of life, liberty, or property without due pro-
cess of law.''

*Frorer* v. *People of State of Illinois,* 16 L. R. A. 492:
''A barber is deprived of property without due process
of law by a statute making it unlawful for him to do
business on Sunday while it does not apply to any other
class of business.''

*Eden* v. *People of State of Illinois,* 32 L. R. A. 659 : ''The constitutionality of a statute must be determined by its provisions, and not by the manner in which it is in fact administered.''

*Grainer et al.* v. *Douglas Park Jockey Club,* 148 Fed. 513 : ''Such an act cannot be held constitutional by construing it to apply only to corporations engaged in a hazardous business, and by permitting the court in such case to determine from the evidence whether the particular business engaged in was hazardous.

''Whenever a statute contains on its face both constitutional and unconstitutional provisions that are not interdependent, a severance between the two and the striking out of the latter are allowable, there being in such case elements between which severance is practicable, but resorting to the evidence in a case to determine whether a subject is within the supposed intent of the general terms employed in the act, which by their plain meaning render the same unconstitutional, is not a severance, but an improper limitation of such terms by judicial construction operating to interpolate in the act what it does not contain.'' ·

*Ballard* v. *Oil Co.,* 81 Miss. 507 : ''The fourth section of chapter 63, Acts 1887, which prohibits persons and corporations engaged in mining and manufacturing, and interested in selling merchandise and supplies, from selling any merchandise or supplies to their employees at a greater per cent of profit than they sell to others not employed by them, is unconstitutional and void, because it is class legislation, and an unjust interference with private contracts and business.''

*State of West Virginia* v. *Fire Creek Coal & C. Co.,* 6 L. R. A. 359 : ''It is not competent for the legislature, under the Constitution, to single out owners and operators of mines and manufactures of every kind, and provide that they shall bear burdens not imposed on other owners of property or employers of labor and prohibit

them from making contracts which it is competent for other owners of property or employers of labor to make. Such legislation cannot be sustained as an exercise of the police power.''

*State of West Virginia* v. *Goodwill et al.* and *State of West Virginia* v. *Minor,* 6 L. R. A. 621: ''A statute requiring weekly payment of wages 'by eyerv manufacturing, mining, quarrying, lumbering, mercantile, street, electric and elevated railway, steamboat, telegraph, telephone, and municipal corporation, and every incorporated express company and water company,' makes an unconstitutional discrimination between those corporations and others which are organized for pecuniary profit and employ labor.''

*Braceville Coal Co.* v. *People of Illinois,* 22 L. R. A. 340: ''An act declaring it unlawful for any person, company, corporation, or association, employing workmen in this state, to make deductions from their wages, except for lawful money, checks, or drafts, etc. 'Held, that the exception by section 6, of farmers, farm laborers and servants, from the provisions of the act, rendered such sections invalid; as depriving miners and manufacturers of the equal protection of the laws guaranteed by the Federal Constitution.' They are also void as an unauthorized interference with the privilege of contracting.''

*Kellyville Coal Co.* v. *Harrier,* 69 N. E. 927: '' A statute restricting the right to discharge laborers because of membership in labor unions is within a constitutional provision against special laws.''

*State of Missouri* v. *Julow,* 29 L. R. A. 257: ''An unconstitutional discrimination in favor of union workmen is made in violation of Constitution, article 4, section 22, prohibiting the passage of any local or special law granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise, by Hurds Rev. Stat. 1899, chapter 48, section 32, making it a misdemeanor to discharge an employee be-

102 Miss.—52

cause of his connection with any lawful labor organization.''

*Gillespie* v. *People of State of Illinois,* 52 L. R. A. 283: ''Section 1 and 3 of chapter 54 of the Session Laws of 1891, having provided, in effect, that for all classes of mechanics, servants, and laborers, excepting those engaged in farm or domestic labor, a day's work should not exceed eight hours, and that for working an employee over the prescribed time, the employer should pay extra compensation, in increasing geometrical progression, for the excess over eight hours,'' etc. ''Held, that these provisions are unconstitutional—first, because the discrimination against farm and domestic laborers is special legislation; second, because, by the act in question, the constitutional right of parties to contract with reference to compensation for services is denied.''

*Low* v. *Rees Printing Co.,* 24 L. R. A. 702: ''Any legislation which is not general in its scope, and which affects only one class or body of citizens, is in conflict with the spirit of this government, the Constitution of the United States, and the Constitution of the state of Illinois. *Eden* v. *People of State of Illinois,* 32 L. R. A. 659.''

*Tacoma* v. *Krech,* 34 L. R. A. 68: ''A law is not general because it operates upon all within a class unless there is a substantial reason why it is made to operate upon that class only and not generally upon all.''

*Ex parte Jentzsch,* 32 L. R. A. 664: ''Per Curiam. It is not competent for the legislature to single out the mining, manufacturing, and smelting industries of the state, and impose upon them restrictions, with reference to the hours of their employees, from which other employers of labor are exempt. An act such as proposed would be manifestly in violation of the constitutional inhibition against class legislation. The bill submitted also violates the right of parties to make their own contracts,'' etc. *In re Eight-Hour Law,* 39 Pac. 328.

The remaining grounds of the demurrer are intended, in the main, to point out wherein the act in question is unconstitutional in its practical application; and, among the foregoing authorities, will be found strong support of each ground of demurrer.

REED, J., delivered the opinion of the court.

The indictment in this cases alleges that the appellee is a corporation, organized under the laws of this state; that it owned, controlled, and operated a saw and planing mill plant, and logging railroad in connection therewith, and was engaged in the manufacture of lumber and the repairing of its machinery used in and about its plant and railroad; and charges that it worked one of its employees more than ten hours per day, not in a case of emergency or where public necessity required, contrary to chapter 157 of the Laws of Mississippi of 1912. There are nine counts in the indictment, each being a charge for working an employee in the different departments of appellee's manufacturing enterprise. Counsel for appellee in his brief states that no point is made as to the form of the indictment. Appellee filed a demurrer to the indictment, which was sustained, and from which the state prosecutes the present appeal.

Chapter 157 of the Laws of Mississippi:

"Employees not to be Worked over Ten Hours in Certain Cases.

"Section 1. Be it enacted by the legislature of the state of Mississippi, that it shall be unlawful for any person, firm or corporation engaged in manufacturing or repairing to work their employees more than ten hours per day, except in cases of emergency, or where public necessity requires in such departments.

"Sec. 2. That any person, firm or corporation violating this act shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than ten nor more than fifty dollars for each offense, and each day's violation shall constitute a separate offense."

While there are seventeen grounds set out in the demurrer, yet they all may be considered in the question of the constitutionality of the law. In order to see fully appellee's contention that the law is violative of our national and state Constitutions, we quote the second ground of demurrer, which is as follows:

"It appears from the face of said indictment that it is based on chapter 157, Laws of Mississippi of 1912, which act is discriminatory, unconstitutional, invalid, and void, and the said indictment is insufficient in law for the following reasons:

"(a)   It is violative of section 14, Constitution of Mississippi of 1890, because it deprives said defendant, and those sought to be made liable thereunder, of liberty and property without due process of law.

"(b)   It is violative of section 16 of said Mississippi Constitution, because it impairs the obligation of contracts between the said defendant, as employer, and its said employees, as well as of contracts between all employers and employees embraced within its terms.

"(c)   It is violative of section 24 of said Mississippi Constitution, because its provisions operate injuriously to the person and property of said defendant and others sought to be made liable thereunder, and deny to said defendant and such others 'remedy by due course of law,' and the 'right and justice' guaranteed by said constitutional provision.

"(d)   It is violative of section 10, article 1, of the Constitution of the United States, prohibiting any state from passing a 'law impairing the obligation of contracts,' because it impairs the obligation of the contracts alleged to have existed between the said defendant and its said employees.

"(e)   It is violative of section 1 of the fourteenth amendment to the Constitution of the United States in three particulars:   (1)   It abridges the privileges and immunities of the said defendant, a citizen of the United

States.   (2) It deprives the said defendant of liberty and property without due process of law.   And (3) it denies to the said defendant, a citizen of the said state of Mississippi and of the United States, 'the equal protection of the laws.'

"(f)  It is violative of that portion of section 2, article 6, of the Constitution of the United States, which makes that instrument and the laws made in pursuance thereof, 'the supreme law of the land,' because it is unreasonable, unjust, arbitrary, and discriminatory, and interferes with the property, liberty, rights, privileges and immunities of the said defendant, and others sought to be made liable thereunder, protected by the aforesaid provisions of the Constitution of the United States."

It will be seen that a corporation in this state is charged with working the men in its employ for over ten hours a day—the indictment says for eleven hours—contrary to the statute, which prohibits such extended hours of labor.   In defense, the appellee claims that the state had no authority to enact such law, that it was contrary to the limitations of the Federal and state Constitutions, that the law impairs the obligation of contracts, abridges the privileges and immunities of the citizen, deprives him of liberty and property without due process of law, and denies him the equal protection of the laws, and that the law is unreasonable, unjust, arbitrary, and discriminatory, interferes with the property, liberty, rights, privileges, and immunities of the citizen, and is, therefore, condemned by the Constitution of the United States.

There has been already in this country much discussion of the laws, like the statute now before us, commonly known as "labor laws."   It seems to be settled that the legislatures of the states have the power to enact proper laws to regulate and provide for the "safety, the health, the morals, and the general welfare of the public."   Appellee contends that the legislature of Mississippi was

not within that power when making the regulation that
the laborer in manufacturing and repairing plants should
not be worked longer than ten hours per day.

In considering questions like the present one, it is well
for us to look at the organization of our nation. In form-
ing our government, "of the people, by the people, and
for the people," the individual surrendered many of his
personal liberties. This was necessary. We could not
have had government otherwise. No society can con-
tinue without its members being required to give up some
of what they deem are their personal rights and liberties.
We cannot imagine any successful government where ev-
ery one has the privilege of doing what pleases him. Reg-
ulations and rules for the control of conduct accompany
as a very necessity every organization. This truth ap-
plies, not only to an association of persons, but as well
to the individual. Every person who succeeds finds it
necessary to control his life by strong rules, sometimes
very hard to obey. Recognizing all this, our forefathers,
in their wisdom, planned to make the necessary rules
for governing the people. They bestowed this power up-
on certain representatives of the people called legisla-
tors. In order to give stability to the statutes to be en-
acted, a Constitution, consisting of certain fundamental
rules and regulations, was ordained and established.
The general governing of the people was at the time and
has continued in the several states, which together formed
the Union known as the United States. Article 10 of the
Federal Constitution recognizes this when it states:
"The powers not delegated to the United States by the
Constitution, nor prohibited by it to the states, are re-
served to the states respectively, or to the people."

The states, when organizing, ordained and established
their Constitutions. In Mississippi, the powers of gov-
ernment were bestowed upon three departments—legis-
lative, judicial, and executive. Section 33, article 4, of
Mississippi's Constitution, clearly announces that "the

legislative power of this state shall be vested in the legislature." It is declared in section 5, article 3 of the same Constitution, that "all political power is vested in, and derived from the people; all government of right originates with the people, is founded upon their will only, and is instituted solely for the good of the whole."

It is, therefore, incumbent upon the legislature to enact all laws necessary for regulating the conduct of the people and the proper use of their property. It is often true that persons will deem their liberties abridged, or the unlimited enjoyment of their property interfered with. Since the beginning of government this has been so. It will continue so long as persons decide from a selfish standpoint, and not from a consideration of the welfare of all citizens. It is the duty of the legislature to consider the interests of all—what is best for society generally. As seen in the foregoing quotation from our state Constitution, it is enjoined upon the lawmakers that "government is instituted solely for the good of the whole." They are necessarily the judges of what is for the good of the citizens.

Seeing that the power to enact necessary and proper laws is granted to the legislature, and the legislators in the very nature of the case must decide what are such laws, then it is plain that the courts should be very careful before holding that any law passed touching the welfare of the citizens is not within the limitations of the Constitutions. The duty of the court is to construe the law and apply it to the case presented, and it may decide that it is contrary to the fundamental laws, which we call our Constitutions. But it is not for the court to decide whether a law is needed and advisable in the general government of the people. This is being more and more recognized by the courts in their consideration of questions of constitutionality. In a recent case, *Noble State Bank* v. *Haskell*, 219 U. S. 104, 31 Sup. Ct. 186, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, the United

States Supreme Court, speaking through Mr. Justice HOLMES, said: "In answering that question, we must be cautious about pressing the broad words of the fourteenth amendment to a dryly logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the bill of rights. They more or less limit the liberty of the individual, or they diminish property to a certain extent. We have few scientifically certain criteria of legislation, and, as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the lawmaking power."

It is certainly true that the power of the state to enact laws for the government of its people, which is usually called the police power of the state, extends at least to the lives, the health, the general welfare and safety of the public, and against the wrongful or injurious exercise by any citizen of what he may deem his rights. The Supreme Court of the United States has "with marked distinctness and uniformity recognized the necessity growing out of the fundamental conditions of civil society of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each state owes to her citizens." *Patterson v. Kentucky,* 97 U. S. 501, 24 L. Ed. 1115.

It was not the purpose of the fourteenth amendment to prevent in any manner the state from making the proper regulations for the promotion of the health, peace, morals, education, and good order of the people. *Barbier v. Connolly,* 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923. Of course, the state cannot by its laws unduly and unnecessarily interfere with a person in the exercise of his inherent rights or the unlimited control and use of

his property. At the same time it must be borne in mind
that the rights of an individual must at all times be sub-
ordinate to the welfare and best interests of society.

The law of this state now under discussion makes it
unlawful for any employer in a certain class to work em-
ployees more than ten hours per day, except in cases of
emergency or where public necessity requires. The leg-
islature, in enacting this law, decided that it was a reg-
ulation needed among the class of the citizens mentioned,
that it was for their best welfare, and that the interests
of the public required the law.

It is contended by appellee that the definition of those
in the class mentioned in the law is too general, and that
it is difficult to limit those who may be engaged in manu-
facturing or repairing. It does not seem to have been
difficult in the instant case. The indictment charges that
the men employed were at work in different departments
of appellee's manufacturing plant, and that appellee was
operating such a manufacturing enterprise, and was also
engaged in the work of repairing all kinds of engines,
boilers, locomotives, cars and machinery used in and
about the mill plant and the logging railroad. It will be
seen, therefore, that appellee's enterprise included both
manufacturing and repairing in its work. A reasonable
definition may be given to "manufacturing" (Century
Dictionary) as the system of industry which produces
manufactured articles, and to "manufacture" as the pro-
duction of articles for use from raw or prepared ma-
terials, by giving to these materials new forms, quali-
ties, and properties, or combinations, whether by hand
labor or machinery, used more especially of production
in a large way by machinery, or many hands working
co-operatively. "Repair" is to make whole or restore
an article or thing to its completeness. In the general
knowledge of the affairs of business and life, it will
hardly be difficult to class those persons who are engaged
in such employment.

It is proper to say that in the early history of the state such persons, because of the very small amount of manufcaturing business carried on, were few in number, the large body of the citizens then following agriculture; but in recent years, on account of the rapid increase in manufacturing enterprises in this state, the same class of persons have grown to a great number, and there is every reason to believe that their number will steadily increase. It is not improper to conclude that the legislature had all this in mind when the law was enacted, and decided that it would affect many of the future citizens of Mississippi.

If it is true that the enactment of this law is for the welfare of the classes affected, and for the best interests of the whole people, then even appellee's right to contract with the laborers named must be subject to the restraints demanded by the safety and welfare of the state. *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, 22 Sup. Ct. 1, 46 L. Ed. 55.

The controlling question in this case is whether the law before us is for the welfare of the people, and whether it will promote the health, morals, and good order of the people affected; in other words, whether it will be a benefit to them.

It is said in the case of *Gundling* v. *Chicago,* 177 U. S. 183, 20 Sup. Ct. 633, 44 L. Ed. 725, that "regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be, and to what particular trade, business, or occupation they shall apply, are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state; and, unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due pro-

·cess of law, they do not extend beyond the power of the state to pass, and they form no subject for federal inter-ference.''

In the case of *Holden* v. *Hardy,* 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780, it is decided that ''the protection of the health and morals, as well as of the lives, of citizens, is within the police power of the state legislature.'' In that case the act of the legislature of Utah, passed in 1896 (Laws 1896, ch. 72), regulating the hours of employment in underground mines, was attacked. Section 1 of that act reads: ''The period of employment of working men in all underground mines or workings shall be eight hours per day, except in cases of emergency, where life or property is in imminent danger.'' This statute was upheld by the Supreme Court. The objections made in that case were practically the same as those made by appellee in the case before us; that is, on the ground of abridging their immunities, depriving them of their property, and denying them the protection of the laws. The court therein considered the objections together, just as we are doing in the instant case. Mr. Justice BROWN, in delivering the opinion of the court, discusses the progress in our laws and the necessity for changes as new conditions arose, and referring to these he said: ''They are mentioned only for the purpose of calling attention to the probability that other changes of no less importance may be made in the future, and that, while the cardinal principles of justice are immutable, the methods by which justice is administered are subject to constant fluctuation, and that the Constitution of the United States, which is necessarily and to a large extent flexible and exceedingly difficult of amendment, should not be so construed as to deprive the states of the power to so amend their laws as to make them conform to the wishes of the citizens, as they may deem best for the public welfare, without bringing them into conflict with the supreme law of the land.''

It is also well known that in the progress of society the relations between employer and employee have changed. Such law as that before us in the instant case may not have been needed half a century ago, but may be needed at the present time. In fact, the department of the government of this state, known as the legislature, has decided that the law is needed.

Under the subject of impairing the obligation of contracts, Mr. Justice Brown, in *Holden* v. *Hardy, supra,* said: "This right of contract, however, is itself subject to certain limitations, which the state may lawfully impose in the exercise of its police powers. While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental to the health of employees as to demand special precaution for their well-being and protection, or the safety of adjacent property." And in *Commonwealth* v. *Alger,* 7 Cush. (Mass.) 84, it is said: "We think it a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. . . . Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as will prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient."

Counsel for appellee in his brief contends that the instant case is controlled by the case of *Lochner* v. *New York,* 198 U. S. 46, 25 Sup. Ct. 539, 49 L. Ed. 937, 3 Ann.

Cas. 1133. In that case it was decided that the limitation of employment in bakeries to sixty hours a week, and ten hours a day, under the New York law of 1897, is an arbitrary interference with the freedom to contract guaranteed by the United States Constitution, fourteenth amendment, which cannot be sustained as a valid exercise of the police power to protect the public health, safety, and morals, or general welfare. A careful consideration of that case fails to show us that it should control the case before us. It seems that the statute omitted the exception in the Mississippi statute, which is in the following words: ''Except in cases of emergency, or where public necessity requires.'' It will be noted that in the case of *Holden* v. *Hardy, supra,* the Utah statute contained this exception. Mr. Justice PECKHAM, in *Lochner* v. *New York,* states that ''the mandate of the statute that no employee shall be required or permitted to work is the substantial equivalent of an enactment that no employee shall contract or agree to work more than ten hours per day, and, *as there is no provision for special emergencies,* the statute is mandatory in all cases.'' And in another portion of the decision, in referring to the Utah statute above mentioned, he said: ''It will be observed that even with regard to that class of labor the Utah statute provided the cases of emergency wherein the provisions of the statute would not apply. The statute now before this court has no emergency clause in it, and, if the statute is valid, there are no circumstances and no emergencies under which the slightest violation of the provisions of the act would be innocent.'' It will be noticed, also, that the decision in *Lochner* v. *New York, supra,* was not unanimous; four of the distinguished members of the bench, Mr. Justice HARLAN, Mr. Justice WHITE, the present eminent chief justice, Mr. Justice DAY, and Mr. Justice HOLMES dissenting. Both Mr. Justice HARLAN and Mr. Justice HOLMES wrote dissenting opinions.

Mr. Justice HARLAN, in his dissenting opinion, said: "Granting, then, that there is a liberty of contract which cannot be violated, even under the sanction of direct legislative enactment, but assuming, as according to settled law we may assume, that such liberty of contract is subject to such regulations as the state may reasonably prescribe for the common good and the well-being of society, what are the conditions under which the judiciary may declare such regulations to be in excess of legislative authority and void? Upon this point there is no room for dispute; for the rule is universal that a legislative enactment, federal or state, is never to be disregarded or held invalid, unless it be, beyond question, plainly and palpably in excess of legislative power. . . . . It is plain that this statute was enacted to protect the physical well-being of those who work in bakery and confectionery establishments. It may be that the statute had its origin, in part, in the belief that employers and employees in such establishments were not upon an equal footing, and that the necessities of the latter often compelled them to submit to such exactions as unduly taxed their strength. Be this as it may, the statute must be taken as expressing the belief of the people of New York that, as a general rule, and in the case of the average man, labor in excess of sixty hours during a week in such establishments may endanger the health of those who thus labor. Whether or not this be wise legislation, it is not the province of the court to inquire. Under our systems of government, the courts are not concerned with the wisdom or policy or legislation. So that, in determining the question of power to interfere with liberty of contract, the court may inquire whether the means devised by the state are germane to an end which may be lawfully accomplished and have a real or substantial relation to the protection of health, as involved in the daily work of the persons, male and female, engaged in bakery and confectionery establishments. . . .

I take leave to say that the New York statute, in the particulars here involved, cannot be held to be in conflict with the fourteenth amendment, without enlarging the scope of the amendment far beyond its original purpose, and without bringing under the supervision of this court matters which have been supposed to belong exclusively to the legislative departments of the several states, when exerting their conceded power to guard the health and safety of their citizens by such regulations as they in their wisdom deem best. Health laws of every description constitute, said Chief Justice MARSHALL, a part of that mass of legislation which 'embraces everything within the territory of a state, not surrendered to the general government, all which can be most advantageously exercised by the states them selves.' "

Mr. Justice HOLMES, in his dissenting opinion, said: "This case is decided upon an economic theory which a large part of the country does not entertain. If it were a question whether I agreed with that theory, I should desire to study it further and long before making up my mind. But I do not conceive that to be my duty, because I strongly believe that my agreement or disagreement has nothing to do with the right of a majority to embody their opinions in law. It is settled by various decisions of this court that state Constitutions and state laws may regulate life in many ways which we as legislators might think as injudicious, or, if you like, as tyrannical, as this and which, equally with this, interfere with the liberty to contract. Sunday laws and usury laws are ancient examples. A more modern one is the prohibition of lotteries. The liberty of a citizen to do as he likes so long as he does not interfere with the liberty of others to do the same, which has been a shibboleth for some well-known writers, is interfered with by school laws, by the post office, by every state or municipal institution which takes his money for purposes thought desirable, whether he likes it or not."

In discussing the obligation of contracts, this court said, in the case of *Mississippi Society* v. *Musgrove,* 44 Miss. 836, 7 Am. Rep. 723: "Individuals must be considered as making their contracts and covenants subject to the contingent right in the state (within the just application of the principles) of partial impairment or total abrogation of their contracts."

In the case of *Moore* v. *State,* 48 Miss. 147, 12 Am. Rep. 367, wherein it was decided that the law prohibiting lotteries in the state was constitutional under the general subject of the police power of the state, SIMRALL, J., said: "The legislative authority rests upon the right, in all these instances, to take care of the health, happiness, morals, and welfare of the community. It is a paramount duty to preserve the public safety. Therefore, the tenure by which private property is held, and the uses to which it is devoted, is subordinate to the police authority, and is not affected and embraced by those provisions of the Constitution which confer on congress the regulation of foreign and interstate commerce, and the inhibition of laws impairing the obligation of contracts. . . . The line which separates the constitutional from the unconstitutional exercise of power of these and many other subjects is dim and shadowy. It is not possible to lay down a general rule of universal application. There is a region where certainty ends and doubt begins. There is no safer rule to guide the judicial mind in all cases of well-founded doubt as to the constitutionality of a law than to refer to the lawmaking department. To pronounce a law, invalid, the judiciary must distinctly perceive and point out its conflict with the organic law."

In the case of *Hart* v. *State,* 87 Miss. 171, 39 South. 523, 112 Am. St. Rep. 437, it was decided that "a statute is not to be condemned as unconstitutional unless it plainly conflicts with some provision of the fundamental law, and conflicts will not be presumed." And in a re-

cent case, *Natchez & Southern R. R. Co.* v. *Crawford,* 99 Miss. 697, 55 South. 596, it is decided that, ''where a statute is fairly susceptible to two constructions, one of which would render it unconstitutional, the courts will adopt that construction which will render it constitutional. All doubts are resolved in favor of the constitutionality of a statute.''

In the case of *Bobo* v. *Y. & M. V. Delta,* 92 Miss. 792, 46 South. 819, it is decided that ''the Supreme Court has no power to pass upon the wisdom or policy of a statute attacked for unconstitutionality.''

Laws regulating the time when men shall labor are not new. The changed conditions during recent years in the business and affairs of the people have brought the discussion of such laws and their apparent necessity fresh to the minds of the present day thinker; but if we will look back through the ages we will find such regulations in the laws of the nations. Particularly, we see them in the statutes governing Jehovah's ancient people, Israel. The greatest lawmaker, who received his inspiration to prepare the ordinances for the government of his people direct from Jehovah, and whose laws have always been admired and approved, wrote special statutes regulating the time in which the people should work, and regulating the use of their property. Exodus 23: 10, 11, is as follows: ''And six years thou shalt sow thy land, and shalt gather in the increase thereof; but the seventh year thou shalt let it rest and lie fallow, that the poor of thy people may eat; and what they leave the beast of the field shall eat. In like manner thou shalt deal with thy vineyard, and with thy oliveyard.'' And notice the provision in Exodus 23: 12, limiting the time in which the laborer shall work:. ''Six days thou shalt do thy work, and on the seventh day thou shalt rest; that thine ox and thine ass may have rest, and the son of thy handmaid, and the sojourner, may be refreshed.''

In the ordinances contained in the Pentateuch, which follow the fundamental law known to us as the Commandments, are many other provisions similar to those above mentioned, and intended to regulate and limit the conduct of the people of Israel. It hardly seems to us to be an unreasonable limitation upon the rights of the people to provide that ten hours should be enough for a day's work, especially when it is coupled with a proviso, so this time may be exceeded in cases of emergency or when public necessity requires.

It is well known that, in the work connected with the running of machinery, the operator is subjected to a mental as well as physical strain. In many cases the nearness to machinery makes the work dangerous in case of an overtaxing of the strength of the worker, or any lessening in his alertness. We can readily understand that all this was in the minds of the legislature when the law now under discussion was considered. Besides, it would not be unreasonable for the legislature to decide that it would promote the health, peace, morals and general welfare of all laborers engaged in the work of manufacturing or repairing if they were not permitted to extend their labor over ten hours a day, and the legislature could also decide that the best interests of the people in the state would be promoted by limiting the time of work of this numerous class of its citizenry to the time mentioned. In fact, when we consider the present manner of laboring, the use of machinery, the appliances, requiring intelligence and skill, and the general present day manner of life, which tends to nervousness, it seems to us quite reasonable, and in no way improper, to pass such law so limiting a day's labor.

Therefore we cannot agree with the contention of appellee that the act in question is "an unreasonable, unnecessary, and arbitrary interference with the property, liberty, rights, privileges, and immunities of those engaged in manufacturing or repairing, and their em-

ployees.'' The legislature of Mississippi has decided that this is not so, and we abide by their decision.

The objection to the statute contained in the several other grounds of demurrer, besides those directed to its constitutionality, have been fully answered by us in this opinion, and it will be seen that we do not consider such objections sufficient.

*Reversed and remanded.*
*Suggestion of error filed and overruled.*